IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**TYSON MEXICAN ORIGINAL, INC.**                                      **PLAINTIFF**

V.                          CASE NO. 5:20-CV-05011

**ROBINSON METAL, INC., d/b/a PRODUCT
HANDLING CONCEPTS, f/k/a PHC3
HOLDINGS, LLC, f/k/a JDL3 HOLDINGS, LLC**                             **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

On March 11, 2020, the Court held a hearing on Defendant Robinson Metal, Inc., d/b/a Product Handling Concepts, f/k/a PHC3 Holdings, LLC, f/k/a JDL3 Holdings, LLC's ("Robinson") Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 6). Robinson argued that it had no contacts with Arkansas and could not have anticipated being haled into Court in this forum. At the time of the hearing, the parties had thoroughly briefed the personal jurisdiction question following a period of jurisdictional discovery. *See* Docs. 22–27. The Court entertained oral argument from each side before denying the Motion from the bench. The following discussion explains the basis for the Court's ruling.

### I. BACKGROUND

Tyson filed its original Complaint (Doc. 3) in Washington County Circuit Court, and Robinson promptly removed the case to this Court, citing the federal diversity jurisdiction statute. The Complaint recounts how Tyson received a request in 2015 from one of its customers to develop a new type of taco shell called a "quesalupa." From Tyson's descriptions of the product, it was to consist of a quantity of melted cheese sandwiched between two tortillas that were crimped and sealed together to lock in the cheesy filling. In order to mass-produce the quesalupas, Tyson searched for a company that would

agree to design and build a quesalupa-making machine that would be housed at Tyson's food processing facility in Fayetteville, Arkansas. On July 26, 2016, Tyson found a designer/builder and entered into a contract entitled "Equipment Design, Production and Purchase Agreement" ("Agreement") with a company identified in the Agreement as "Product Handling Concepts, a JDL3 Holdings, LLC Company." *See* Doc. 3, p. 16.

The Court understands that JDL3 Holdings, LLC, was a Wisconsin-based limited liability company that formed in March of 2015. Public records confirm that the company was dissolved in March of 2017. Product Handling Concepts appears to have been the trade name under which JDL3 Holdings, LLC, was operating when it entered into the Agreement with Tyson in 2016 to design and build the quesalupa-making machine. According to a public document provided by Robinson, three days after Tyson and Product Handling Concepts signed the Agreement, another company called PHC3 Holdings, LLC ("PHC3"), registered to do business in the state of Minnesota. *See* Doc. 26-2. All of Tyson's invoices for costs related to the design and construction of the quesalupa-making machine originated from PHC3. By the same token, Tyson sent all of its payments to PHC3. Though the Court is still not clear exactly how Tyson went from doing business with JDL3 Holdings, LLC/Product Handling Concepts to doing business with PHC3, all parties agree that PHC3 was the entity that performed under the Agreement and was paid by Tyson in exchange for that performance.

As for Robinson, the named Defendant in this lawsuit, it is a Wisconsin company that fabricates and sells metal. According to the Declaration of Darrell LaCrosse, one of Robinson's co-owners, Robinson first heard about PHC3 through one of Robinson's independent sales representatives named David Steichen. (Doc. 25, p 1). Steichen

pitched to Robinson the idea for a start-up company that would design and build metal machines—using Robinson's metals. Robinson's co-owners thought the idea sounded promising. *Id.* at p. 2 (explaining that Robinson decided to invest in PHC3 "to help out a *potential* long-term customer" (emphasis added)). Less than a week after Tyson entered into the Agreement, the limited liability company known as PHC3 was born and began performing under the Agreement using the trade name "Product Handling Concepts."

The undisputed facts show that PHC3 was formed with the full knowledge, leadership, and financial support of Robinson's co-owners, Darrell LaCrosse and Todd Robinson. PHC3's operating agreement was executed the same day the company registered to do business in Minnesota, *see* Docs. 25-2 & 26-2, and that document reveals that on the day of incorporation, Steichen (Robinson's sales representative) was named PHC3's President/CFO/Secretary; LaCrosse (Robinson's co-owner) was appointed to PHC3's Board of Governors; and an individual named Jim Livermore was named CEO. The operating agreement also identifies a second company, EGP Investments, LLC ("EGP"), as possessing a 75% ownership interest in PHC3. Interestingly, EGP was registered with the state of Minnesota on the same day as PHC3. *See* Doc. 26-3. EGP was jointly owned by Steichen, Livermore, and a third company called LAROB, LLC— which was wholly owned by Robinson's co-owners, LaCrosse and Robinson. *See* Doc. 25-1. LAROB, LLC, contributed $100,000 of start-up capital to PHC3 through a transfer of funds to EGP. (Doc. 25, p. 2). And since EGP owned a 75% interest in PHC3, Robinson's co-owners consequently owned a share—albeit a minority share—of PHC3. (Doc. 27, p. 9). Important to the discussion here, however, is the fact that *Robinson Metal, Inc.*, was never identified in the operating agreement as an owner of PHC3.

Less than a year after the quesalupa machine-making venture was under way, Product Handling Concepts/PHC3 began delivering prototypes to Tyson for testing. Tyson maintains that by April of 2017, it was becoming clear that the machine was not working as promised. PHC3 was given time to fix the machine, and Tyson ordered spare parts from PHC3 to make repairs in-house. All of these attempts failed, and momentum on the project ground to a halt. By the end of July of 2017, about a year after the parties entered into the Agreement, Tyson declared the venture to be a total failure and placed the defective machine and associated spare parts in storage. In the instant lawsuit, Tyson claims that it paid PHC3 $4,297,207.76 from July 2016 to April 2017 and incurred separate labor and materials costs totaling $104,788.76, as well as spare-parts costs in excess of $400,000. (Doc. 3, p. 8). Tyson seeks the recoupment of these funds as damages.

The reason why the Defendant in this lawsuit is Robinson and not PHC3 goes to the heart of the dispute about personal jurisdiction. According to Robinson's corporate representative, who was deposed in connection with the jurisdictional discovery ordered by the Court, Robinson was the exclusive supplier of metal to PHC3. (Doc. 24-2, p. 90). At some point between the time the quesalupa machine failed and Tyson threatened legal action, Robinson became interested in purchasing PHC3. By March 9, 2018, Robinson and PHC3 were ready to sign an asset purchase agreement that carefully left out any of PHC3's assets related to Tyson and specifically denied any assumption of liability as to the failed Agreement between PHC3 and Tyson. The asset purchase agreement was scheduled to close by March 31, 2018; however, on March 22, 2018, PHC3 received Tyson's demand letter (Doc, 24-4), which stated in no uncertain terms that Tyson was

contemplating legal action. Again, according to Robinson's corporate witness, PHC3's receipt of Tyson's demand letter prompted a restructuring of the asset purchase deal "to avoid potential liability to flow into Robinson Metal." (Doc. 24-2, p. 161). Robinson and PHC3 decided that *EGP*—the entity jointly owned by Steichen, Livermore, and LAROB, LLC—would first "foreclose" on PHC3's assets (with the exception of assets related to Tyson) and then deliver those assets to Robinson through an asset purchase agreement. *See* Docs. 24-1 & 24-3. This multi-part transaction was intended to insulate Robinson from a future allegation that it assumed responsibility for PHC3's potential liability to Tyson. (Doc. 24-2, p. 165).

In the Motion to Dismiss, Robinson contends that because it so carefully and intentionally structured its purchase of PHC3 so as to avoid liability to Tyson, the Court should find that Robinson lacks sufficient minimum contacts with Arkansas and is not subject to personal jurisdiction. The Motion stresses the fact that, under Arkansas law, the general rule is that a corporation that purchases the assets of another corporation does not assume the liabilities of the seller. Tyson responds that there are some exceptions to this general rule against successor liability, and Tyson believes Robinson's purchase of PHC3 falls within one of these exceptions. The question for the Court at this early stage of litigation is whether Tyson has made a prima facie showing that the Court may exercise personal jurisdiction over Robinson.

## II. LEGAL STANDARD

It is well established that a plaintiff must state enough facts in a complaint to support a reasonable inference that the defendant is subject to the jurisdiction of the forum. If the defendant challenges that jurisdiction, then "the plaintiff's 'prima facie

5

showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto.'" *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004) (internal quotation marks omitted). However, "[a] threshold determination that personal jurisdiction exists 'does not relieve [the plaintiff] . . . . at the trial of the case-in-chief from proving the facts upon which jurisdiction is based by a preponderance of the evidence.'" *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989) (quoting *United States v. Montreal Tr. Co.,* 358 F.2d 239, 242 n.4 (2d Cir. 1966), *cert. denied,* 384 U.S. 919, *reh'g denied,* 384 U.S. 982 (1966)). A court may find that a plaintiff has made a prima facie showing and then "reserve all factual determinations on the issue for trial." *Serras*, 875 F.2d at 1215.

The district court may only exercise jurisdiction over a defendant who is not a resident of the state if "personal jurisdiction exists under the forum state's long-arm statute and . . . the exercise of personal jurisdiction is consistent with due process." *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010). Constitutional due process requires that a non-resident defendant "have 'minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Pangaea v. Flying Burrito*, 647 F.3d 741, 745 (8th Cir. 2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "Sufficient contacts exist when the defendant's conduct and connection with the forum State are such that [the defendant] should reasonably anticipate being haled into court there." *Soo Line R.R. Co. v. Hawker Siddeley Can., Inc.*, 950 F.2d 526, 528 (8th Cir. 1991) (internal quotation marks omitted). Finally, the nature of the contacts between the defendant and the forum must be purposeful and "must not arise due to mere fortuity." *Pangaea*, 647 F.3d at 745.

The parties in the case at bar do not dispute that PHC3—which is now defunct—voluntarily submitted to personal jurisdiction in Arkansas when it entered into business with Tyson. But PHC3 is not the defendant here. The parties' true dispute concerns whether Robinson stepped into PHC3's shoes for personal jurisdiction purposes when it purchased PHC3's assets. Several Courts of Appeal have explicitly held that a successor corporation that is a mere continuation of its predecessor may be bound by the predecessor's submission to a court's personal jurisdiction. *See, e.g., Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 654 (5th Cir. 2002); *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991); *City of Richmond v. Madison Mgmt. Grp.,* 918 F.2d 438, 454 (4th Cir.1990); *Duris v. Erato Shipping, Inc.*, 684 F.2d 352, 356 (6th Cir. 1982). These cases all generally hold that "[a] corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor." *Bowman*, 927 F.2d at 1131.[1]

Turning to the law of this forum, the Arkansas Supreme Court has held that a corporation that purchases the assets of another corporation does not ordinarily assume the liabilities of the seller. *Swayze v. A.O. Smith Corp.*, 694 F. Supp. 619, 622 (E.D. Ark. 1988). However, there are at least four exceptions to this general rule against successor

---

[1] Although the Eighth Circuit has not ruled on this specific issue, it has acknowledged that a court could exert personal jurisdiction over a CEO who did not have minimum contacts with the forum state when his company—which *did* have minimum contacts and was the CEO's alter ego—was subject to the forum's personal jurisdiction. *See Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc.*, 519 F.2d 634, 637 (8th Cir. 1975). Considering the reasoning in *Lakota*, the Court is confident that the Eighth Circuit would agree with its sister Circuits that a corporation's contacts with a forum may be imputed to a successor corporation if the forum's state law would hold the successor liable for actions of the predecessor.

liability: (1) where the transferee company assumes the debts and obligations of the transferor by express or implied agreement; (2) where there is a consolidation or merger of the two corporations; (3) where the transaction is fraudulent or lacking in good faith; or (4) where the purchasing corporation is a mere continuation of the selling corporation. *Id.* (citing *Reed v. Armstrong Cork Co.*, 577 F. Supp. 246, 247–48 (E.D. Ark. 1983)). In all four of these situations, Arkansas recognizes that the purchasing company may be liable for the debts and obligations of the company it purchased.

### III. DISCUSSION

Under the first exception to the rule against successor liability, there must be an express or implied agreement that establishes that the purchasing company actually assumed the selling company's debt or obligation. Here, the asset purchase agreement at issue excluded PHC3's potential liability to Tyson. So, exception one does not apply.

Moving on to the second exception, Tyson argues that Robinson's purchase of PHC3's assets constituted a de facto merger. (Doc. 24, p. 17). "A de facto merger occurs where one corporation is absorbed by another but without compliance with the statutory requirements for a merger . . . . Such a merger makes the surviving corporation liable for the claims against the predecessor corporation." *Arnold Graphics Indus., Inc. v. Indep. Agent Ctr., Inc.*, 775 F.2d 38, 42 (2d Cir. 1985). To determine whether a de facto merger has occurred, the reviewing court must look behind the form or label of the transaction and focus instead on its substance. *See Pratt v. Ballman-Cummings Furniture Co.*, 549 S.W.2d 270, 273 (Ark. 1977). The Eighth Circuit has instructed district courts to look to the following factors to ascertain whether a de facto merger has occurred:

> (1) whether the transaction has resulted in a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations;

8

(2) whether the transaction has resulted in a continuity of shareholders by virtue of the fact that the purchasing company paid for the acquired assets with shares of its own stock;

(3) whether the seller corporation ceased its ordinary business operations, liquidated, and dissolved as soon as legally and practically possible; and

(4) whether the purchasing corporation assumed those obligations of the seller that were ordinarily necessary for the uninterrupted continuation of the seller's normal business operations.

*Keller v. Clark Equip. Co.*, 715 F.2d 1280, 1291 (8th Cir. 1983).

Beginning with the first factor above, the Court observes that even though PHC3 physically relocated from to Robinson's facility, there is ample evidence of a clear continuity of management and personnel before and after the asset purchase.[2] The managers and employees of PHC3, including PHC3's former CEO and its President, joined Robinson's staff and now run a separate division within Robinson called Product Handling Concepts. (Doc. 24-10, pp. 9–16). The evidence before the Court indicates that Product Handling Concepts performs the same work that PHC3 once performed—except under the umbrella of Robinson. Further, even though PHC3 possessed minimal assets at the time of the foreclosure and asset purchase, there is no dispute that the few assets PHC3 once possessed now belong to Robinson, including perhaps the most valuable one: the trade name "Product Handling Concepts." The Court finds that this first factor weighs in favor of a finding of de facto merger.

---

[2] Although the Agreement with Tyson was made effective as of July 26, 2016, it was executed by Jim Livermore, in his capacity as "President/CEO" of "Product Handling Concepts," on August 3, 2016. In between those two dates, Jim Livermore signed PHC3's Operating Agreement as a founding member. *See* Doc. 3, p. 22; Doc. 26-2, p. 2; and Doc. 25-2, p. 34. Mr. Livermore has continued his employment with Product Handling Concepts since Robinson acquired its assets and began operating it as separate division using the same trade name. *See* Doc. 38, p. 21, lines 20-25.

The second factor considers whether Robinson paid for PHC3 with shares of its own stock. The answer to that question is clearly, "no," as Robinson intentionally structured its acquisition of PHC3 so as to avoid paying for the assets with shares of Robinson's stock. Robinson worked with an intermediary company—directly owned by PHC3's officers and indirectly owned by Robinson's co-owners—to foreclose on PHC3's assets. Then the intermediary sold the assets to Robinson.[3] This factor weighs against a finding of de facto merger.

The third factor asks whether the seller corporation—here, PHC3—ceased its ordinary business operations, liquidated, and dissolved as soon as legally and practically possible. It is undisputed that Robinson required PHC3 and its owners to enter into a non-compete agreement. (Doc. 24-8). In that sense, PHC3 was required to immediately cease its ordinary business operations, otherwise it would be in violation of the non-compete agreement. The vast majority of PHC3's employees and all of its managers and owners went to work for Robinson after the transaction closed. Finally, Robinson purchased the vast majority of PHC3's assets, which meant that PCH3 was unable to stay in business. The Court finds that the third factor weighs in favor of a finding of de facto merger.

The fourth factor considers whether the purchasing corporation—Robinson—assumed the obligations of the seller—PHC3—that were necessary for the uninterrupted continuation of PHC3's normal business operations. The facts before the Court show

---

[3] Robinson's corporate representative testified that no money changed hands between Robinson and EGP as a result of the asset purchase agreement. Further, Robinson did not pay cash for *any* of PHC3's assets. Instead, Robinson "purchased" PHC3's assets by agreeing to forgive a debt that PHC3 allegedly owed to Robinson. *See* Doc. 24-2, p. 123.

that Robinson assumed certain liabilities of PHC3's, including the obligation to perform on various open contracts. Additionally, Robinson required PHC3 to disclose its top ten clients and vendors as part of the overall asset purchase agreement. As previously discussed, Robinson also retained PHC3's managers and other employees, which demonstrates that Robinson intended the uninterrupted continuation of PHC3's normal business operations—under the umbrella of Robinson and as a separate Robinson division. The Court finds that the fourth factor weighs in favor of a finding of de facto merger.

In sum, Tyson has stated sufficient facts to support a reasonable inference that Robinson is subject to the jurisdiction of this forum due to the de facto merger exception to the successor liability doctrine. Three out of the four *Keller* factors strongly support such a finding. Accordingly, the Court sees no need to consider whether other exceptions to the successor liability doctrine may also apply. However, the Court's ruling here is merely "[a] threshold determination" that "does not relieve [Tyson] . . . at the trial of the case-in-chief from proving the facts upon which jurisdiction is based by a preponderance of the evidence.'" *Serras*, 875 F.2d at 1214. The Court "reserve[s] all factual determinations on the issue for trial." *Id.* at 1215.

## IV. CONCLUSION

**IT IS ORDERED** that Robinson's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 6) under Rule 12(b)(6) is **DENIED**.

**IT IS SO ORDERED** on this 14th day of April, 2020.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE